# THE LAW OFFICE OF JEFF CHABROWE

521 Fifth Avenue, 17th Floor New York, NY 10175 | Tel. 917.529.3921| F 914.462.3637

August 19, 2024

<u>VIA EMAIL</u>
Erica T. Vest
U.S. Probation Officer
Eastern District of New York
7 Johnson Street
Brooklyn, NY 11201
erica_vest@nyep.uscourts.gov

      Re:  *United States v. John Yiu*, 1:23CR00089-001(HG)
          Defense Supplemental Information for Pre-Sentence Report     and Objection

Dear Ms. Vest:

    I would like to submit additional, more detailed information regarding Dr. Yiu's extraordinary family circumstances, both current and historical, and in particular how they relate to the offense conduct. It appeared to us the Pre-Sentence Report as drafted provided insufficient information in this regard. We also submit an Objection to the Report.

## I. SUPPLEMENTAL INFORMATION

### A. Severe Ongoing Family Medical Crises

    The Pre-Sentence Report refers generally in ¶ 80 to the fact that Dr. Yiu's wife, Thic Leng, has been experiencing continuing breast cancer treatment following a mastectomy in 2022. But it does not describe the complications from that treatment, its impact on the family unit and the critical role Dr. Yiu plays in her care. The PSR described medical crises being simultaneously experienced by the children in the family, and elderly parents, in cursory terms that also do not provide a full picture of the collective impact on family functioning and the critical role Dr. Yiu plays at this time to sustain his family.

    Thic Leng's health difficulties started with her pregnancies. She had cardiac issues and required emergency room treatment several times. She was monitored for palpitations but received no treatment. She was informed in 2020 that her mammograms showed unusual density. Because of the pandemic, she was unable to follow up. She had another mammogram in 2022. She required another and was quickly diagnosed with breast cancer. It presented as a State 2 Level 3 aggressive invasive carcinoma. It has metastasized to her lymph nodes. Ms. Leng had a single mastectomy in March 2022. She was on chemo for six months starting in April 2022. She had to have a mammogram, ultrasound, and MRI every few months; she was monitored very closely.

Starting at end of October 2022, Ms. Leng had 25 sessions of radiation treatment. By June of 2023, Ms. Leng experienced pneumonitis and pulmonary fibrosis, which are rare side effects of the radiation. She needed steroids to treat the pneumonitis. She had permanent scar damage to her lungs. Pulmonary fibrosis is non-curable and progressive; it can also become carcinogenic. Her breathing has been significantly weakened. She stayed home at a reduced wage. Dr. Yiu took care of her throughout these years of medical crises. In August of 2023, Ms. Leng had reconstructive surgery with a transplant from her stomach.

Ms. Ling continues with chemotherapy medication to prevent breast cancer recurrence. She will have to continue it for the next 10 years. She will have to continue a hormone blocker for the rest of her life. The side effects of this medication includes osteoporosis and severe joint pain and stiffness, greatly limiting her ambulation. The high dose steroids she has received over an extended period has given her stomach ulcers, causing constant abdominal pain, and reducing her appetite. It ages her. She has joint pain and stiffness. It is hard for her to get up and to move. But she cannot sit for prolonged periods of time because her body tightens up. Ms. Leng still gets infusions at Sloan Kettering to treat the severe osteoporosis resulting from the chemotherapy.

During this time, the couple's oldest daughter was in college but at home for weekends. The second daughter was in high school and at home. Their son Ryan was at home. Dr. Yiu makes meals for the entire family, brings his wife's medication to her, takes her blood pressure, and monitors her condition, takes her to medical appointments. He also looks after the children, taking them to school and afterschool events. She can't do any extra duties.

Their daughter Jenna has developed GI problems that have not yet been diagnosed. She has chronic abdominal pain and irregular bowel. Their son Ryan developed severe myelitis. He has surgery in January 2024 and was in the hospital for four months. His bone was opened, and the infection scraped. It was extremely painful. He had to receive IV treatment three times daily for an extended period. Dr. Yiu has monitored all their care and provided for them as well as his wife. The PSR reference to these problems is cursory. ¶ 81.

Dr. Yiu and his wife have also had primary responsibility for care of Dr. Yiu's parents. In June of 2019, his father had a stroke. Dr. Yiu wanted his wife to quit work to take care of him. He was desperate to increase their financial means so she could do so. His siblings were supposed to take turns caring for their father, but the responsibility all fell to Dr. Yiu. Recently, Dr. Yiu's father had another stroke in April 2024. He was taken off life support and died shortly thereafter. Dr. Yiu's mother is also in significant decline. She had neck surgery in April 2024 with complications of left shoulder paralysis for several months afterwards. She now has left shoulder weakness and severe neck pain. She has had three spinal surgeries. She has had a rotator cuff tear. She has diabetes, high blood pressure, and is essentially bedridden. She has had bilateral hip necrosis and had total left hip replacements six years ago. Her legs are numb and weak; she is virtually bed bound. She requires constant pain management with regular injections. She has dementia, which worsened after his father passed away. She currently lives with Dr. Yiu and it totally dependent on him financially and for medical and daily care. She has social security benefits and SSI only, no pension from the father. She gets her medical care under Medicaid/Medicare; Dr. Yiu is her treating physician. Dr. Yiu receives no help from his siblings. His mother has lived with them for so long that the other siblings disregard her situation.

### B. Preceding Family Trauma

The circumstances of Dr. Yiu's offense cannot be separated from the extensive, historical trauma experienced by both his family in China and in particular the grueling ordeal of his wife in Cambodia and their escape therefrom.

First, Dr. Yiu's family was punished during the Cultural Revolution in China. His parents were professionals and therefore regarded as class enemies. They emigrated to the U.S. to escape persecution, but thereafter worked in unskilled labor positions. His parents worked in sweatshops and restaurants. The change to a greatly reduced socioeconomic status was traumatic for Dr. Yiu.

Dr. Yiu's wife Thic Leng had an extremely difficult upbringing. She was born in Cambodia in 1973, just before the Khmer Rouge took over under the murderous regime of Pol Pot. She later listed her birthday as 1975. Her father was killed in 1975 as soon as the war started. He was an engineer. His mother moved out to work in the countryside Thic Leng stayed with her grandmother in Pnom Phenh. They lost contact because the Khmer Rouge cut communications. She did not meet her mother again for many years. The mother ended up remarrying in the country and had four children. The grandmother "reduced" Thic Leng's age so she would not be sent to a labor camp (children as young as 4 went to labor camps to pick twigs). She had no schooling. The young people were malnourished. Her grandmother got a limited food allotment, and they had canteen and community feeding.

By 1979 the Vietnamese had taken over. Thic Leng walked by foot to Thailand with her grandmother. An aunt and uncle were able to rejoin them. They walked on foot for about a week. She was six years old. When they got to the Thai border, they begged a guard to let them in. They got to a refugee camp. They were assigned to the Red Cross and received food and water. They lived in huts in the camp until 1981. The family had heard refugees were able to get sponsored by charities for relocation to United States. They pushed for this sponsorship and eventually obtained one. In September 1981, the family (and its single members) landed at JFK airport.

Immigration officials assigned birthdays by numbering entrants off. Thic Leng's family lowered the young members' age to get into school. One uncle had gotten to the U.S. earlier. He was able to obtain an apartment for the family in the Bronx. A refugee organization gave them furnishings and supplies, but everything was stolen. Another relative told them to move to Brooklyn with him. The family found an apartment in Sunset Park. They collected thrown out furniture. Family members worked as busboys or in any jobs they could get.

An uncle signed Thic Leng up for school in first grade. Aunts went to school, and then they worked at night sorting mail at the USPS. The grandmother stayed home and took care of them. Because of their charity sponsorship, the family lived here with green cards. Eventually they became permanent residents. Thic Leng was in ESL classes for two years, then mainstreamed. grades 1 and 2, then mainstreamed.

Thic Leng worked hard at her studies. She attended Stoney Brook University in 1993 with Pell grants and by work study. She majored in Biochemistry and completed a four year degree. She did an extra year in a special psychology program. She had met John Yiu in her freshman year in 1993; they started dating the next year. John was in the same program. After their graduation they worked for three years and then got married in 2001. They both worked as cytotechnologists for Quest Laboratories in New Hersey. Thic Leng still works there 26 years later.

As a new couple, John Yiu and his wife moved to Lodi, New Jersey to be nearer their employer. The grandmother stayed in Brooklyn with the youngest uncle. One uncle wrote letters for years trying to find his sister, Thic Leng's mother. He sent them to hundreds of charities and organizations. By some luck a letter reached the mother. When Thic was 18 years old, she met her mother for the first time in over a decade.

Eventually John Yiu went to medical school in St George. The couple lived apart; Thic's mother moved in to help her. John took extra classes, graduated, and returned to the U.S. in 2003 to 2005 for clinical rotation. They settled into their married life.

## II. PRE-SENTENCE REPORT OBJECTION

The Pre-Sentence Report states at ¶ 45 that a departure under USSG §5K2.21. may be warranted because, it asserts, Dr. Yiu participated in the medically unnecessary dispensary of other drugs, aside from diclofenac epolamine, and this additional conduct was not accounted for in the guidelines. Thus, an upward departure may be warranted under USSG § 5K2.21.

The defense objects to any such suggested upward departure. The data submitted by the Center for Medicare and Medicaid auditors suggests that the vast majority of the prescriptions targeted in this scheme was diclofenac epolamine. More to the point, it cannot be assumed that every single prescription Dr. Yiu prescribed was illegal or medically unnecessary. In fact, contrary to the PSR statement (¶ 31) the records show Dr. Yiu prescribed diclofenac epolamine, and other drugs, well before the period of time he is charged with participation in this conspiracy.

The defense and the government have stipulated a loss figure of $624,959.45. The defense does not seek to deviate from that figure. But it strongly opposes any upward departure from it. Dr. Yiu is charged with health care fraud by receipt of kickbacks. In *United States v Pikus*, 2015 US Dist LEXIS 78307 (EDNY June 16, 2015), the Eastern District of New York, in calculating restitution, expressly rejected the view that "kickback taint" rendered all reimbursed prescriptions a loss and instead adopted a loss calculation based on benefit conferred on the defendant. It adopted an 11th Circuit decision in *United States v. Vaghela*, 169 F.3d 729 (11th Cir. 1999) (reasonable to assume amount of kickback was equivalent to loss sustained by government). It noted the Second Circuit had endorsed the same view in a civil context, citing *United States v. Zangari*, 677 F.3d 86, 93 (2d Cir. 2012). ***While the Pikus court was considering loss calculation for restitution purposes, it noted the kickback amount had also been used for guideline loss calculation under 2B4.1 (improper benefit).*** The Southern District of New York

4

accords. *United States v Schlifstein*, 2020 US Dist LEXIS 87886 (SDNY May 19, 2020, No. 18-CR-217 (KMW)); *United States v Celestin*, 2004 US Dist LEXIS 10933 (SDNY June 10, 2004).

Dr. Yiu's charged conduct alleged some medically unnecessary prescriptions were written. But Dr. Yiu's guilty plea allocution <u>expressly excluded that allegation</u>. See attached. However, even with this allegation, loss calculation must attempt to dissect necessary from unnecessary. See *United States v Vaid*, 2017 US Dist LEXIS 143495, at *32-33 (SDNY Sep. 5, 2017) ("as to each individual claim that the Government intends to prove was fraudulent because goods or services were either medically unnecessary or not provided, it must identify…the claim and whether the goods or was not provided or was medically unnecessary", citing *United States v. Nachamie*, 91 F. Supp. 2d 565, 574 (S.D.N.Y. 2000) (requiring the Government in Medicare fraud prosecution to identify each and every one of the "false and misleading" claims).

Based on these facts and the relevant law, the defense rejects any contention an upward departure may be warranted under § 5K2.21.

          Respectfully submitted,

          *Jeff Chabrowe*
          **JEFFREY CHABROWE, ESQ.**
          **LAW OFFICES OF JEFFREY CHABROWE**
          521 Fifth Avenue, 17th Floor
          New York, NY 10175
          (917) 529-3921
          *Counsel for John Yiu*

|     | Proceedings                                                   | 7 |
|-----|---------------------------------------------------------------|---|

1  between August of 2019 and the end of 2020, beginning of 2021,
2  the defendant conspired with others, specifically owners of a
3  pharmacy called AC Pharmacy in Brooklyn, to refer patients to
4  the pharmacy in exchange for kickbacks. Some of the drugs
5  that were referred were not medically necessary. All of them
6  were procured by kickbacks.
7           THE COURT: Mr. Yiu, do you understand that that is
8  the charge that you'll be pleading guilty to today?
9           MR. CHABROWE: To be clear, Judge, the charge is
10 kickbacks. There isn't -- the medically unnecessary is not an
11 element of the crime.
12          MS. GLASER DAUERMANN: It is not an element of the
13 crime, but it is charged in the indictment and that's part of
14 the charge.
15          THE COURT: Is it necessary for his allocution?
16          MS. GLASER DAUERMANN: No, it's not.
17          THE COURT: You can represent to me that that's
18 something that the government would be able to prove, but for
19 purposes of the allocution, I just want to be clear that it's
20 not necessary; is that correct?
21          MS. GLASER DAUERMANN: That's correct, Your Honor.
22          THE COURT: Mr. Chabrowe, do you believe that based
23 on your interactions with your client that he understands
24 these charges that he's pleading guilty to?
25          MR. CHABROWE: Yes, he does.

*Nicole Sesin, RPR, RMR, CRR*
*Official Court Reporter*